The Honorable, the judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Good morning. Please be seated. Blue Cross Blue Shield v. Jemsek, Mr. Brown. May it please the Court. This circuit has repeatedly held that a court necessarily abuses its discretion when it makes an error of law. The decision of the Bankruptcy Court, which was adopted by the District Court, is plagued by errors of law, both with respect to the imposition of sanctions and the amount of those sanctions. Each of those errors of law stand as a separate and independent reason to reverse the decision of law. Turning to the first error of law that was committed by the Bankruptcy Court, the Bankruptcy Court concluded in its order, in the joint appendix at page 1,257, that Blue Cross Blue Shield, quote, repeatedly violated the Florida court's injunction by continuing to prosecute this adversary proceeding through discovery after May 31, 2007. The Bankruptcy Court erroneously concluded that Blue Cross Blue Shield was a signatory medical society to the Love Court settlement and therefore was precluded from taking any action pursuant to the injunction by the Love Court. Both sides, both the plaintiff, Blue Cross Blue Shield, and the defendant, Jemsek, informed the Bankruptcy Court that this was an error, that the injunction in Love does not preclude Blue Cross Blue Shield from going forward with its claims. And that's important in this case. Jemsek argued in trying to stay the proceedings, or arguing against a stay of discovery, that Blue Cross Blue Shield's claims would go forward and discovery would be needed regardless of what took place or what was enjoined by the Love Court with regard to any counterclaims. And that was a fundamental flaw in the Bankruptcy Court's decision. The Bankruptcy Court concluded that all of this discovery was unnecessary because it was enjoined and barred by the Love settlement and the order that was issued by Judge Marino in the Love case. But first, the Bankruptcy Court... My question is, you're the one who used the settlement as a defense to the counterclaims. Your Honor, I would assert that we do not assert it as res judicata. It's not asserted as... But you asserted it as a defense. It was not asserted in this case as a defense. The effect was the Love Court issued an injunction that precluded Jemsek from going forward with these claims. That was not anything that was a defense of... In fact, didn't you raise that as a defense before the Bankruptcy Court? No, Your Honor. As a defense to the counterclaims? No, Your Honor. It was not asserted as a defense to the counterclaims. Well, how was it asserted? It was asserted because the Love Court issued an injunction precluding the Jemsek defendants from going forward with their counterclaims. That was action that took place... So the injunction was asserted as a defense? No, Your Honor. The Jemsek defendants, once they were faced with that injunction and once they realized that they were subject to the contempt power for the Southern District of Florida, abandoned those claims. They recognized, they sought the approval of the Bankruptcy Court to amend their pleading so it didn't include those counterclaims. That was all action that took place in the Love Court. It had ancillary impact upon this case, but that was not a defense that was asserted in this action. The Jemsek people went down to Florida and they tried to get the Florida court to reconsider, and then they appealed that, correct? And their claims were steadily rejected by the Florida courts, isn't that right? Yes, Your Honor. So then they came back and they said to the Bankruptcy Court that you all had proceeded in bad faith, and then there was this suggestion that they were entitled to all these attorney's fees and to have the action that the Bankruptcy Court took. Isn't that what happened? Yes, Your Honor, and the Bankruptcy Court was very upset that the Southern District of Florida was making determinations that impacted what he could do in a bankruptcy proceeding in the Western District of North Carolina. Right, and the Bankruptcy Court's whole view was that you should somehow have, you did give notice, your client did give notice to them, they didn't, they acknowledged that, but they said they didn't know what the notice was, or they didn't take note of the notice of the case, but the Bankruptcy Court thought that you should have done more than that. That's the gist of it, and when you go through the record, I think it is clear that Blue Cross Blue Shield did everything that it should have done, given the interrogatories, given the disclosure obligations, and if you go through the 71-page decision of the Bankruptcy Court, it is plagued with errors of law that constitute an abuse of discretion. Assume that you're right, how do we untangle this thing in terms of what sanctions are allowable and which ones are not? Your Honor, there are errors both with respect to the award of any sanctions, and then there are separate errors of law with regard to the amount of those sanctions. We believe that any of those errors merit a reversal of the District Court's decision, but we also believe that should you agree that there was no basis to impose any sanctions, it should be a reversal with instructions that the sanctions be set aside, and Blue Cross Blue Shield should not be allowed to impose any sanctions. Blue Cross Blue Shield be allowed to go forward with its claims, the principal claims in this case, which are seeking $16.3 million of medical reimbursement that was provided to Dr. Jemzik, even though those services did not comply with the standard of care, there were incorrect billings that were made, and Dr. Jemzik himself, he was sanctioned by the North Carolina Medical Board for engaging in this unorthodox practice of law, and it was a fraud on Blue Cross Blue Shield, and it was a fraud on their insurance. Well, I understand that. All right, let me just take you down a list. I assume, number one, you think that it was an error to dismiss all your claims in bankruptcy, so you want that correct? Yes, Your Honor. Secondly, you want to get out from under the attorney's view or from the left circuit, because that bankrupts the court. Absolutely, that is a clear error of law, Your Honor. And thirdly, that you don't want to be charged fees for opposing the sanctions. And what else? Well, Your Honor, those are the principal errors of law with regard to the amount of the sanctions, but when you also look at the other errors of law, when you look at the basis for the decision to impose sanctions, it is clear that the decision to award any sanctions has to be reversed. You said you were under no obligation whatsoever to inform the Bankruptcy Court of the law of settlement and the impact that the settlement had upon the bankruptcy case in North Carolina. You're just under no obligation to let the Bankruptcy Court know about that? Your Honor, the Bankruptcy Court was informed when it came to the attention of the attorneys involved in this case. But, of course, you can't really rely on that, because that's very akin to their argument that they didn't really have notice of what this notice was. It seems to me both of you are saying, well, our lawyers didn't know, and that's just not, you know, that doesn't go anywhere. So it seems to me, at the very least, you would say in response to Judge Wilkinson's opinion, all right, on May 31st, the Love Court issues its preliminary injunction, right? I can understand up until that time. Is that right? Preliminary and joint parties from litigating released claims. All right? Bear with me. Just take it on faith for the moment, because we're using up your time. Okay. Okay? So what was it that made you wait until March 31st to tell the court about it? Your Honor, You didn't know about it? Well, That is an issue. Also, the deadline, there really, until the deadline to opt out of the Love class action comes into play, it really has no effect. And, moreover, it's not, Well, that's not so. It's not that it has no effect, but that it might be rescinded. So as a good litigant, you'd want to keep it until you're absolutely sure. Okay. Well, the notice of proposed settlement is mailed and published on July 27th. The deadline to opt out was September 14th. Yes, Your Honor. Okay. So we have the period between September 14th, at least, until March 31, when they can't do anything. You may not know about it, but some Blue Cross lawyer somewhere knows about it. Right? I mean, I understand why you didn't know about it. I take you at your word. And, first of all, I was just involved in the appeal. It's your case now. I know. I know, Your Honor. I've been in this courtroom where Judge Winter has said, it's your case now. I understand, Your Honor. There are a couple of things that have to be addressed briefly. First of all, the bankruptcy court, yes, with hindsight, if it had been possible to notify the court earlier, if there had been a connection between the corporate chain of knowledge, certainly. But even on March 31st, We're reviewing this for abuse of discretion. This particular thing. This is not an error of law question. Whether the fees were allowed in that period, we're reviewing whether the bankruptcy court has discretion to issue them. And the fees during that time period are extremely limited. It's set out in the record. But the point is, you have to have Maybe in rebuttal, you can tell me where it's set out in the record. The record is large, and the docket is even large. So it's hard for me to know exactly what fees were attributable to the period after May 31st. I know you don't think that's a critical date, but if we should. Yes, Your Honor. And the amount of those fees would be $20,324. That is set out in the joint appendix at page 1,316. From May 31 to March 31? From May 31. I'm sorry. From the opt-out deadline of September 14, 2007 to March 31, 2008. $20,324. But of course, they get their fees for asking for fees. That's foreign work law. Well, Your Honor, that could all be calculated from the joint appendix at page 1,312. That would be a huge victory for you. So I don't even know why you're fighting about that. Well, Your Honor, I also have to point out, absolutely, that to throw out $16.3 million of legitimate claims that Blue Cross Blue Shield had to impose sanctions of 1.3 The opt-out date was September of 2007. Yes, Your Honor. The notification was not given to the bankruptcy court until March of 2008. That's a substantial lapse of time. I mean, even assuming that you could have waited until the opt-out date, even after the settlement was reached and all the rest. What reason was there for not notifying the bankruptcy court between September 2007 and March 2008? Why did the court not know about something that was obviously going to be very relevant to what was going on in the bankruptcy court? And that you were going to serve the settlement as a defense to the counterclaims. And you did it, as far as I can see. You made use of that law of settlement as a defense to the counterclaims. And the bankruptcy court all along, not to mention Mr. Jemczak, were kept in the dark about something you planned to serve. Your Honor, I recognize that I have gone over my time. Can I respond to that? No, answer the question. Absolutely. First of all, even on March 31st, 2008, Jemczak was disputing whether the Love case had any applicability. Why did you not notify them of the settlement? Your Honor, it was a disconnect within the attorneys in Florida and the attorneys in North Carolina. But the important thing is... But that's on you. No, Your Honor. It is not, because you have to look at the bankruptcy court and what authority did they use to impose sanctions. You don't get there under Rule 26. You don't get there under the interrogatory. So there is no legitimate basis that the district... So your view is that litigants have to, from here on out, can act with impunity in not informing bankruptcy courts or district courts of highly relevant information that they plan to use in litigation. In this case, it just seems to me like you wanted to, at a very minimum, allow the opt-out date to pass so that Mr. Jemczak would be bound by the settlement and by the release. Blue Cross Blue Shield did the best that it could under the circumstances and... What do you mean it did the best it could? It didn't notify the court. How is that the best it could? Well, Your Honor, there... Again, there was... With hindsight, we could all do this differently. But what's important is, is there a violation that took place that gave rise to sanctions and is set out in our brief? There clearly is not. Thank you. Mr. Fletcher? Thank you. May it please the Court. I'm William Blakely. I'm from the Post-Mortem Law Firm, and I've been involved in this case a good part of it after the 11th Circuit decision. This case is about the bad faith of Blue Cross in hiding from the Bankruptcy Court, our law firm, and from the... And we even argued the defendants themselves. The case and the implication of that case in North Carolina. This case... You know we have an adversary system, right? We have an adversary case. Each side is entitled to their lawyers. Yes. And your client was notified of the Love case, correct? Our client... I want to address... Yes, Your Honor. Yes. We did not... Just let me... Just let me follow up. I'll let you go. Your client was notified of it. Your client is on notice of it. What ethical... They would be violating the rules of ethics if they had continually said, Well, don't you want to join this? Don't you want to dispute this case? That's not their obligation. Your Honor... Excuse me. I'm sorry. Sure. We do not know whether Dr. Jemczyk actually received the notice. It doesn't make any difference. He was sent the notice. He was given notice. You conceded that. We did. We conceded that the notice had been mailed. That is absolutely... That's all they're required to do. We did not. Yes, you are right. That notice went out, but there's an other obligation here in this case. Basically, your point that as a class member, Dr. Jemczyk, I think, people receive notices of settlements who are class members all the time. They toss them in the wastebasket. It's not... It doesn't seem to be a notice sent to class members. It doesn't seem to be anything that, you know, with a raft of mail that arrives at a layman's address. It doesn't seem to me that you would take any particular, necessarily take any particular notice. That's your view, is it? Well, yes, your Honor. It was more complicated, too, because, one, Blue Cross file suit. Dr. Jemczyk petitioned to have bankruptcy protection. There were confusing issues about the mail. All I can say is yes, your Honor. The notice... So what should they have done? They didn't hear from Dr. Jemczyk, so they should have written a follow-up letter to him? No, they should have notified the bankruptcy court. Why? Because... Here is why. Because later, Blue Cross claimed that what... Well, let me set the chronology. Because of the counterclaims that Dr. Jemczyk asserted, he asserted them... So they could say these counterclaims are going to be... might be settled in this Florida case, and I want to be sure, Dr. Jemczyk, that you know they're going to be... might be settled in the Florida case? Their obligation is to their client, not to your client. They answered the counterclaims, and they didn't disclose to the court, to our law firm, anything about the fact that they were going to be raising these defenses. In fact, this came up later in the motion for a stay. It wasn't a defense. The Florida court just kept rejecting your views. And finally, the bankruptcy court had to recognize... and you recognized it. You recognized that they rejected your views, and you asked for all these sanctions. Well, what happened is the... this whole case, I think Judge Whitley, and it's not in the record, but during the hearing, I mean, this whole case should have gone down to Florida. This is the problem. Well, that may be true, but the Florida court wasn't dealing with that. That's your problem. Your problem was with the Florida court in the 11th Circuit. No, our problem was not there because those counterclaims, Blue Cross later came in and said the counterclaims in the bankruptcy court are identical to the claims in Florida. They didn't tell Judge Whitley or anybody else that. These are identical claims, they said, and that is how they ended up. That issue was then taken to Magistrate Torres, affirmed by Judge Moreno, and it went up to the 11th Circuit. Was the default, was the problem here that they didn't notify you, they didn't notify the court of the Love settlement, or was the problem that, I mean, normally in litigation, people would notify the opposing party in a status conference of what claims and defenses they planned to raise. Is what you're really complaining about the fact that you did not get advance notice of the defenses that they planned to raise, do you count that? They didn't give advance notice of any of these defenses. That's a separate thing, isn't it? That's a separate thing. Well, it is, except that Judge Whitley and his law clerks, Judge Mullen, Judge Cogburn, we're all going and battling it out in discovery. And here is, in fact, the order, which is, for the record, page 596. This is what Judge Moreno had entered in March of 2007. All discovery and any proceedings against or concerning the blue parties and tag-along actions inserting any release claims are hereby stated and suspended. So what we have is there's an injunction, a state order, in Florida that is effective in March of 2007, and we are up in bankruptcy court. We're spending a million dollars fighting back and forth. Judge Whitley is reviewing documents in camera. Those counterclaims, if they were unrelated to Florida, we wouldn't even be having this discussion today. But Blue Cross came back and argued that these were identical. These were compulsory counterclaims that we launched on behalf of Dr. Jemsi in the adversary proceeding. And then Blue Cross, a year later, argued that these counterclaims were identical to the claims of the plaintiffs in love. Was the March 8, 2007 order final? No. No. Discovery has stayed. Yes. No, Your Honor. It was a preliminary state order that was entered. You are correct. And the settlement was a settlement between the parties. And there's confusion in the briefs between what Blue Cross's North Carolina counsel knew. Yeah, but there is no final settlement that anybody knows about until July. Until July? 2007. No, to September. It's a deadline to opt out. The deadline to opt out was September 14, 2007. So there's no final date. Until then, they're telling you about it, in addition to the notice that your client has gotten, would be to betray their client the fiduciary relationship they have with their client. I don't think so. I think they have an obligation to Judge Whitley to tell him that there's an injunction that these claims that have been asserted in your court, Judge, are in joint. But apart from the notice that may have been sent to you as a class member, if he's a party to litigation, and you were representing him, you were aware that he was a party to the Florida litigation and a class member, why wouldn't you notify the court of the low settlement? Oh, no, Judge. Because it could be undone. It's temporary. You were safeguarding the rights of your client. That's why you wouldn't notify them. Although the argument is they didn't know about it. But I know your client didn't know about the notice either. Nobody knows anything. I want to make sure that it's really clear. Our law firm, nobody, Judge Whitley, I don't think, knew. I mean, that's part of the order. Our law firm, nobody knew. Nobody said to us, by the way, there's this love case in Florida. If they had said that, what would you have done? Well, we certainly would have discussed it with Judge Whitley, and we wouldn't have been spending all this. Okay, but what would you have affirmatively done? You wouldn't discuss it with Judge Whitley. You wouldn't file motions in this case. So what would you have done? Oh, I think Judge Whitley would have held a hearing on every issue. And certainly whether or not these counterclaims – But it's down in Florida. You know about the Florida action. What do you do? Well, you know, at this point, I think they would have opted out. Judge Whitley found that he would have opted out. Exactly. You know what, though? There's another thing. And I think, Your Honor, you addressed this. Right after September 14th, if they're really not hiding the ball, why didn't they disclose it then? Well, I think that's a really good point. Okay, I can tell you why. Because there's a fairness hearing. If he's in the Florida case, he's in there. No, there's no way. But how could you not have known anything about the low settlement? Excuse me, Your Honor? How could you not have known, your firm not have known anything about the low settlement? You know, these counterclaims were completely – they were not that clear. Blue Cross made the argument successfully, I might add, later that these claims were different. The claims in North Carolina really dealt with the amount of money that – the counterclaims that Blue Cross owed Dr. Jemczyk. They owed him over a million dollars. This was a preemptive strike that they made in September of 2006. So Dr. Jemczyk became the defendant, and he lodged counterclaims. Those counterclaims should have been – There is a danger here when you look at it from a broader perspective that you're given the breadth of the sanctions, which dismissed the Blue Cross claims, that your client could be just getting away completely hopscotch and free from a massive amount of insurance fraud and overbilling. I mean, this is, you know, not a negligible thing here, but he's winding up with a large award of attorney's fees, plus apparently or possibly has committed a massive insurance fraud and is getting a windfall in terms of the sanctions order and the attorney's fee order. I mean, that's something that – None of the results here sit all that comfortably with me. I'm not – Either way you go, you're left with a sense of unease, one on somebody taking advantage of the court, but the other, you're just realizing the windfall. There's at least some reason to believe, depending on adjudication on the merits, that your client has badly abused the insurance billing process. I'm actually grateful you brought that up. I was actually not going to be discussing the merits of their claim, but I found their comments in the brief at a minimum regrettable. Doctor, there is a public policy issue about Lyme disease in this state and across the country. This lawsuit was all about Blue Cross not wanting to pay for antibiotics beyond 28 days, and they didn't recognize Lyme disease even in North Carolina at the time, as I understand. So this is really a battle over – Well, then that means you're going to win if you actually have to defend against Blue Cross' claims, right? Well, I think that is a fair comment, but my point – So you're not facing this huge judgment because you're going to win? Well, Your Honor, this gentleman's already put into bankruptcy. This has been an arduous task, and I might add – Is he practicing medicine now? I beg your pardon? Is he practicing medicine? Yes, Your Honor, he's practicing in Washington, D.C. D.C.? Yes, he is. Isn't there some prohibition against him practicing in North Carolina? No, there's not. What happened is he went before the medical board. Actually, there was a case pending here about a month ago on the issue. It involves the conduct of the medical board in this case, and I'm not handling that. I'm not involved in it, but I'm just saying to you, this whole issue about the medical board and what happened – But he can't be practicing in North Carolina? I believe he can come back and practice, and he may be challenging that in North Carolina. But he was suspended then for a time? He was suspended, but it was stayed. I have to ask you the right question. No, no, you are very correct. He was suspended. It was stayed. There were issues, waiving appeal. And so he actually – But they did put some limits on what he could do. Dr. Jemczyk prescribes and deals with the chronically ill people that have Lyme disease. And in his professional opinion – I'm not a doctor, but that is not curable with 28 days of antibiotics. And Blue Cross, when they went in in September of 2006, they not only defensively tried to not pay him over a million dollars that they owed him, but they went and tried to recoup four years back for the statute of limitations. Well, there's some medical judgment that that is not the appropriate treatment. I beg your pardon? There's some medical judgment that his views are not the correct ones. Isn't that right? That's why I wasn't going to raise it today, but I did really think I should make a comment in response. The breadth of the sanctions here were not – couldn't all be attributable to a lack of notice. The lack of notice can't be the cause of all of these – I mean, why would a lack of notice, for example, lead to the dismissal of all Blue Cross's claims? Well, I mean, that would seem to be the – is that attributable to a lack of notice? How are you prejudiced in terms of defending against Blue Cross's claims by the absence of notice? We were actually operating in North Carolina before Judge Whitley. But were you handicapped in your defense in some way by a lack of notice of the Love settlement? Well, sure, Your Honor, because we're counsel of record. We have an obligation to the debtor. I mean, the legal fees in this case are astronomical. How were you handicapped in your defense to the Blue Cross claims by the fact that the bankruptcy court didn't receive notice of the Love settlement? Because these claims were enjoined and – or stayed, would be a more accurate – in Florida, and these claims, these counterclaims, the whole package would have and should have been picked up, sent down through the MDL Committee or informed the MDL Committee, sent down to Judge Moreno for resolution. That's what should have happened. The Love settlement was a release that affected the counterclaims. But how did the Love settlement affect Blue Cross's case going forward? I mean, the Love settlement, what it did was it was a bar, so they say, to assertion of the counterclaims by virtue of the release in the settlement. But how does that – I still don't understand how that would necessarily mandate the dismissal of all of Blue Cross's claims. Well, I didn't judge Whitley's mind, but he was upset about having not been informed. I understand he's upset, but that's not a point of law. No, I agree. What? No, because these – You want to talk about upset? We'll get upset. I hope not at me. I'm trying my best here. I get upset too, but it doesn't get me very far. No, because these claims were stayed, Your Honor, and they should have been resolved as – by the way, we were counsel of record in the Powderly case. Now, Powderly didn't come up until around March of 2008. We launched a lawsuit on behalf of Dr. Powderly. Bingo. That case is brought to the attention of – But why shouldn't the district court revisit the sanctions in light of the prejudice that was actually caused by an absence of notice? Let's assume you're right, that they should have – and there's a question about that that my colleague, Judge Motsch, raises about the functioning of the adversary system. But let's say as a class member – It's a class member. You're not all that aware of some of these things. And let's say that they didn't inform the court of defenses that they planned to raise to the counterclaims. So we can give you that. But still, it can't be that – There's got to be some more refined analysis of the prejudice to you by the absence of the notice of the love settlement. And what was – I don't know why the sanctions order wasn't more carefully tailored to whatever prejudice was caused by the love, the absence of notice, and the basis for that sanction, the legal basis spelled out. Certainly after September 14, 2007. I mean, he was in the love case even though he didn't know it. And he couldn't even go to the fairness hearing. And there are set-offs. Judge Whitley, how is he going to be dealing with the value of the claims that were resolved in love and compare that up in his court? How is he going to try that case? Those counterclaims should have been – What about the claims in the case in chief or the plaintiff's claims? How were they impacted? And why were they subject to dismissal as a result of the love settlement or a lack of notice of the love settlement? I think that Judge Moreno in Florida would have resolved that because that's why he entered a stay on page 596 of the order. He orders a stay of all discovery concerning the blue parties and tag-along actions. That's why they didn't do the tag-along. They would have had to notify Judge Whitley. By the way, here are these counterclaims that have been lodged. They are identical to the claims by the love plaintiffs. But the release purely pertained to the counterclaims, did it not? The release released – well, what happened is – The counterclaims that he raised in North Carolina. Yes, that is correct. I think that is correct.  Yes, that release definitely released claims. And that was what was before Magistrate Torrey. The Blue Cross didn't release anything. No, but they were stayed. I think that is – they didn't release, but they were – but the other claims of the putative plaintiffs were released. And what I'm saying is the other claims related to that were stayed. So, in conclusion, I see my red light is on here. I just wanted to say one about the stay. And there's another comment about Dr. Jemczyk electing to not opt out. He never elected not to opt out. As of Rule 23 notice, yes, he didn't opt out. Whatever happened to that notice, we don't know, and that's history. But he didn't consciously elect. Well, that's what they said in their brief, so I just want to make that clear. So, for purposes of judicial conservation, the amount of money spent in this case, the sanctions are pittance compared to what Blue Cross has spent and what we have spent. And, frankly, this whole case should have been packed up and it would have been resolved differently had notice been given to Judge Whitley, and we all could have then dealt with these claims that Blue Cross later asserted were identical, and they were clearly, they admitted compulsory counterclaims. Thank you for your attention. Mr. Brown. Thank you. I think the overarching issue in this case is what court, what jurisdiction should be deciding this very difficult issue of the impact of the love settlement. And I think the answer to that has clearly got to be the Southern District of Florida and the Eleventh Circuit. This issue was carefully examined. The issue of the validity, the effect of the class action notice, it was examined by a magistrate judge for the Southern District. Why is that necessarily so? Because the court doesn't decide the res judicata effect of its own judgments. The res judicata, the preclusive effect, well, any preclusive effect is generally resolved by the court that gets the action later in time, not by the issuing court. The res judicata really isn't an issue here. It is the injunction that was clearly in the hands of... The effect of the release is an issue. And wouldn't the effect of the release and the impact of a release be a matter for the later court to resolve? No, Your Honor. The settlement was not applied as a defense. There was no res judicata defense. What kept the Jim Sick defendants going forward was the settlement and love and the injunction. And that is something that appropriately should be decided by the Eleventh Circuit. Well, they went down there to the Eleventh Circuit. And then, failing that, they got these fees. They decided that that would be the alternative route for making them whole. It was a way to circumvent the effect of the Eleventh Circuit's decision. And before the magistrate judge, in a decision that was affirmed by Judge Marino and ultimately blessed by the Eleventh Circuit, the quoting from the magistrate judge's decision or recommended findings of fact from the Southern District of Florida at page 893, Jim Sick's final argument is that it would be inequitable to preclude the counterclaims because the counterclaims were compulsory. So the Eleventh Circuit, the appropriate court, looked at what was fair and equitable and had no problem. And there's also a... Did the bankruptcy court base any of its sanctions on a finding that it disagreed with the Eleventh Circuit? Well, Your Honor, there is language throughout that gives you a strong sense of why the bankruptcy court did what it did. Well, I know they're mad at you. Well, no, they're mad at anybody taking jurisdiction over something that they viewed to be assets of the bankruptcy estate. I would direct the court's attention to the hearing on April 8, 2008, at page 742. Quote, this is a quote from the bankruptcy court judge. This is a state property subject to the Western District's exclusive jurisdiction. I'm trying to figure out how the class action rules allow another court, Article III or not, to be dictating how the claim can proceed unless you get relief from the state. I understand what you're saying. But what I'm asking you about is in the order that came out and the issuance of fees, was the basis for that the disagreement with the Eleventh Circuit? No, Your Honor. The bankruptcy court, at the end of the day, in his 71-page order, made clear of that. But it also, I think, explains to the court why there are errors involved. It may explain, but it's not a reason for it. Let me ask you this. Other than the class action settlement notice, is there a reason that Dr. Jemczak should have, leaving the class action settlement notice to one side, is there a reason, independently of that, that Dr. Jemczak should have been aware of the love settlement and aware of the love litigation such that he should have informed the bankruptcy court of the love settlement? Was that why? Is that on him? Can awareness be charged to him, in your view, or not? Your Honor, he was clearly on notice of the love settlement. By the form notice of the class action settlement. Those things, as I say, they go on and on for page after page after page with all these different provisions. I'm sure this fellow's not a lawyer, and really a lot of people because they're thousands of class members or sometimes they're just awesome. But what I'm wondering is, is there any reason Dr. Jemczak or his attorney should have been aware, is there any reason to charge them with awareness of the love proceeding such that they should have, independently of the class action settlement, have notified the North Carolina bankruptcy court? Your Honor, no court was obligated, no party was obligated to notify the bankruptcy court, Blue Cross Blue Shield or Jemczak. They clearly were aware of the notice. It was published widely in medical journals, USA Today. Notice was mailed. And, Your Honor, if I could turn very briefly to one point or one statement by Mr. Blakely. He pointed out that on March 31st, 2008, his statement was that the counterclaims were not that clear. It was uncertain as to whether the love settlement actually barred these counterclaims. Under those circumstances, how in the world could Blue Cross Blue Shield possibly be faulted for not going to the court sooner? It went to the court March 31st, 2008, well before the settlement in the love case was approved on April 20th, 2008. For the reasons set out in our brief, we would ask that the decision below be reversed. Thank you. Thank you. We'll come down and re-counsel and move into our next case.
judges: J. Harvie Wilkinson III, Diana Gribbon Motz, Henry F. Floyd